**STATE OF OHIO, Plaintiff-Appellee v. URICK, Defendant-Appellant.**

Ohio Appeals, Second District, Franklin County.

No. 3689.   Decided February 28, 1944.

Ralph G. Bartlett, prosecuting attorney, Columbus; T. Vincent Martin and Henry Holden, assistant prosecuting attorneys, both of Columbus, for plaintiff-appellee.

Milton L. Farber, Columbus, and Samuel Wolman, Columbus, for defendant-appellant.

## OPINION

By BARNES, P. J.

The above-entitled cause is now being determined as an error proceeding by reason of defendant's appeal on questions of law from the judgment of the Court of Common Pleas of Franklin County, Ohio.

The defendant was indicted and tried on a charge of second degree murder, allegedly occurring on August 14, 1943. After trial the jury returned a verdict of manslaughter. Motion for a new trial was filed, overruled and the defendant sentenced to the penitentiary.

Within due time defendant filed notice of appeal and thus lodged the cause in our court.

Appellant sets out 11 separately numbered and stated assignments of error. In counsel's brief these assignments are reduced to three in number, as follows:

"(1)  The Court below erred in admitting testimony offered by the state in chief.

(2)  The Court erred in permitting an improper cross-examination of defendant.

(3)  The Court erred in failing to charge the jury as to the purpose for which evidence of previous acts were received at the time the testimony was offered."

From an examination of the bill of exceptions in connection with the briefs we very quickly determine that all three grounds of error are very closely related. We will very briefly summarize some of the facts so as to have an understanding of the background and the probative force of the evidence supporting the contention.

The defendant, James William Urick, was a man approximately 56 years of age. Up until February, 1943, he had lived in Ashland, Kentucky. He was a married man and had three grown children. He was separated from his wife, although not divorced. For a period of about eight years the defendant lived with one Pauline Caudill, as man and wife, in Ashland, Kentucky. At the time they started living together, Pauline was about eighteen years of age. In December, 1942, Pauline came to Columbus to live with her mother, and in February, 1943, Pauline had the defendant come to Columbus and for a time they continued to live together as husband and wife.

Sometime in the summer of 1943, Pauline met a man about her own age, by the name of David Ritchey and immediately started keeping company with him. Even at this time Pauline and the defendant Urick were living together as man and wife at Pauline's mother's. After a time Urick moved to another location and Ritchey moved in as a roomer. Sometime in August Pauline and Ritchey became engaged and later procured a license to marry and the wedding day was set for about the middle of August. As far as the record discloses Pauline and the defendant continued to be friendly and from time to time she would go to see him at his living quarters, and the defendant would give her money, and very shortly before the time for the wedding, bought her a dress. When the defendant learned of the engagement between Pauline and Ritchey there was testimony that defendant appeared at the

home of Pauline's mother and told the latter that he would cut the hearts out of both of them before they could get married. On or about August 14, Pauline and the defendant had a chance meeting, as was a frequent occurrence, at a cafe or saloon, and during this time possibly quarreled some. The proprietor ordered them to leave and out on the street as they were going in the direction of Pauline's home, they met up with Ritchey. They all walked along together and they went into the home. There was slight evidence of quarreling before they reached the home and this was continued. The evidence was very much in conflict as to what was said and done and as to who was really the aggressor. In the trial of the case the defendant put up the plea of self defense. Ritchey was stabbed in the groin, the wound being about an inch and a half in depth and according to the testimony of the Coroner, severed a vein, bringing on a hemorrhage from which Ritchey died the following day. In the mix-up Pauline was also cut in the hip. The defendant's defense was that of self defense. The evidence disclosed that the defendant was a small man, weighing about 130 pounds or less, had a broken back and only one eye from injuries received many years previous in Kentucky. The decedent was a large man, 24 years of age, weighing in the neighborhod of 180 pounds.

As heretofore stated, there was much conflict in the evidence as to just what was said and done by the respective parties, but it was evident that the jury resolved all doubts in favor of the contention of the state. Without detailing the evidence we would say that there was sufficient evidence presented to warrant the jury in returning its verdict as returned.

As heretofore stated, counsel for defendant bases its claimed errors on the question of introduction of evidence and the failure of the Court to instruct the jury as to the purpose of such evidence.

During the presentation of the State's case in chief, Pauline Caudill was the last witness called. At Page 56 and the preceding pages, Pauline was being inquired of in chief by one of the assistant prosecuting attorneys as to the detail of the happening in the home and attendant injuries to Ritchey and herself. After exhausting the inquiry as to what she knew about Ritchey's injuries, the prosecutor then asked her:

"Q. And where were you cut? A. In the right hip."

The next question to which objection was made was as follows:

"Q. Had the defendant at any other time ever cut you?

MR. FARBER: I object.

THE COURT: What is the objection?

MR. FARBER: This man is charged with the murder of Ritchey. Now, are we going to offer testimony as to proof of character?

THE COURT: Oh, no.

MR. FARBER: Past acts with reference to somebody aside from the deceased in this case?

THE COURT: Other similar acts would be competent.

MR. FARBER: I don't agree with Your Honor. I would like to be heard on that.

THE COURT: Very well.

MR. FARBER: Outside the presence of the jury, if Your Honor please.

THE COURT: Very well. The jury will be dismissed for a few minutes. * * *."

(And thereupon the jurors and the witnesses left the court room.)

MR. FARBER: If Your Honor please, the question asked by the prosecutor here apparently seeks to elicit testimony to the effect that the defendant may at some former time have had a quarrel and cut this witness. I presume that is the expected answer. Now, we are trying a murder case here involving the killing of the deceased, which has no relation to anything that may have happened three, four, five, six or seven years ago. Now I submit that it would be prejudicial in the absence of any testimony from the defendant as to his good character to admit testimony to be offered at this time as to his bad character, which is the exact effect of the testimony they attempt to elicit now.

THE COURT: What about the application of 13444-19?

MR. FARBER: I believe that statute having to do with previous commissions has to do with a trend of conduct.

THE COURT: Motive or intent?

MR. FARBER: Motive and intent which must in some manner have relation to the instant case.

THE COURT: Well, of course, the provisions, Mr. Farber, are rather broad. As you will recall, this statute provides, 'In any criminal case where the defendant's motive, intent, the absence of mistake or accident on his part, or the defendant's

scheme, plan or system in doing an act is material, any like acts or other acts of the defendant which may tend to show his motive, intent, the absence of mistake or accident on his part, or the defendant's scheme, plan or system in doing the act in question, may be proved, whether they are contemporaneous with or prior or subsequent thereto'.

MR. FARBER: I submit to Your Honor from that statute the defendant is charged here with having with intent killed one David Ritchey. Now, I say to you that the intent which they must establish here has nothing to do with any intent which may have happened several years ago.

THE COURT: All of the decisions under this statute give the Court very broad latitude in permitting other similar acts of the accused to be introduced in evidence, whether they are contemporaneous with or before or after the occurrence.

Now, the claim of the State here is that the deceased was cut with a knife. This witness says she was cut with a knife. Now, it just seems to the Court that it is entirely proper to show a similar act upon this witness or any other person, either prior to or subsequent.

MR. FARBER: Well, with reference to this witness, he is not charged with that offense; and I disagree with the Court—

THE COURT: But he is charged with cutting the deceased, which resulted in death.

MR. FARBER: That is right; but it has no relation to the cutting of this particular witness.

THE COURT: It does have some relation to the motive or intent.

MR. FARBER: The intent that they are attempting to establish in this case has no possible relation to any cutting that may have taken place prior to the time Ritchey appeared in the picture.

THE COURT: The Court feels it does.

MR. FARBER: Note an exception.

THE COURT: The objection will be overruled. If you don't have anything further you may call the jury back."

(And thereupon the jurors and the witness returned to the court room.)
(Question read)

"A. Yes, sir.
Q. When was that, Pauline? A. It was in the fall of '42.
Q. Fall of '32? A. '42.

Q. '42. Now you say you met Ritchey in March? A. Yes, sir.

Q. Of 1943? A. Yes, sir.

MR. MARTIN: You may take the witness."

At Page 79 of the record, being cross-examination by Mr. Farber, of the witness Pauline, we find the following:

"Q. Now, Mrs. Caudill, there was some statement made on direct examination with reference to your having been cut by Mr. Urick some time ago, when was that? A. It was in the fall of '42.

Q. '32? A. '42.

Q. That was down in Ashland, Kentucky? A. Yes, sir.

Q. Was Mr. Urick arrested for that? A. Yes, sir.

Q. And he was released the same day, was he not? A. No, sir.

MR. MARTIN: Wait a minute, I object.

MR. HOLDEN: Wait a minute.

THE COURT: What is the purpose of it?

MR. FARBER: Oh, I don't think it matters a great deal, I will withdraw the question, I don't care."

Again, at page 133, during the cross-examination of the defendant by the assistant prosecuting attorney, we find the following:

"Q. Now, do you remember cutting Pauline in November of last year?

MR. FARBER: Just a moment, we want to note an objection on the same ground we voiced yesterday.

THE COURT: The objection will be overruled for the same reason.

MR. FARBER: Note an exception.

MR. MARTIN: Read the question, Mr. Rohr.

(Question read)

MR. FARBER: Answer the question.

THE WITNESS: Answer this question here?

MR. FARBER: Yes.

THE WITNESS: I remember when it happened, yes.

Q. You cut her in the left groin, too, didn't you? A. I don't know where she was cut at.

Q. Would you say that she was not cut in the left groin? A. You mean—when are you talking about?

Q. Last November. To refresh your recollection— A. Oh, yes.

Q. She was walking down the street with a friend of hers? A. She was not walking down the street.

Q. All right, tell us about it. A. She started, came out of the restaurant by me and I had been walking on a cane and had my knife cutting the head of my cane down and when she came out I went to catch her and she kind of got cut on the knife, that is the way that happened.

Q. She wasn't walking with a friend? A. No, sir, if she was I didn't see her.

Q. Where was it, where did that happen? A. It happened in Ashland.

Q. And you were arersted on that, were you not? A. Well, they taken us up to Police Court, I don't know whether I was arrested for that or not.

Q. And she didn't appear against you down there and you were released, isn't that what happened? A. Yes, sir.

MR. FARBER: Now, if Your Honor please, I assign this as error for the reason that yesterday when Mrs. Caudill was on the witness stand, I attempted to cross-examine her on these various points; there was an objection and the Court sustained the objection.

THE COURT: Well, there has been no objection to any question subsequent to the one where he was asked about the cutting.

MR. FARBER: Your Honor, please, the objection was as to any testimony about that cutting, that is the objection yesterday, that was on the same question we objected to yesterday.

THE COURT: The understanding was there was only an objection to the one question this morning.

MR. FARBER: We objected yesterday.

THE COURT: That was the question which was directed to the witness at that particular time.

MR. FARBER: We objected yesterday to the entire line of examination on the ground that it is not proper and the Court overruled the objection and wouldn't permit me to examine their witness on the same thing. Now, we have made the same objection on the same ground and they have been going right along.

THE COURT: Well, of course, if there is an additional objection because of the fact that the witness Caudill had not

been cross-examined on this there should have been an objection made upon that ground. The Court did not so understand there was any such objection pending or made.

MR. MARTIN: Your Honor please, I might explain why the objection was put in by the State of Ohio yesterday as to whether or not this defendant was released.

MR. FARBER: May I ask that the jury be excused and this matter be disposed of? I am very serious.

THE COURT: Very well, members of the jury, you will be excused at this time until you will be called by the bailiff.
* * *"

(And thereupon the jury was excused from the Court Room.)

And thereupon follows a very lengthy dissertation between the Court and counsel for the defendant and counsel for the State. It was very clearly presented in this talk that Mr. Farber had a misunderstanding as to what his objection included and just what, if any, ruling the Court made. We have no difficulty in agreeing with the trial court that Mr. Farber was not interferred with in his cross-examination of the witness Pauline.

The trial court did ask the question as to what was the purpose, but this does not necessarily infer that the Court was going to rule against the question. When the Court made the inquiry Mr. Farber should have informed the Court as to the purpose, and thereafter the Court would have passed on the objection. Under this situation, if the Court had ruled against Mr. Farber then his record would be saved. On the other hand, if the Court would have overruled the objection, which he should have done, then Mr. Farber might have continued with his cross-examination had he so desired.

We might quote the trial court's statement in finally overruling the objection of counsel for defendant, for the reason that it presents a view of the trial court as to the reason for the competency of evidence that was being objected to:

"Now, it is the feeling of the Court that that leaves only the basic question which we had yesterday, as to whether under Section 13444-19 this type of testimony is competent, and the Court ruled that that section is broad in its scope, and that this type of testimony—that is an additional offense, additional act of this defendant, namely, a cutting in 1942, is competent for the purpose of showing intent, motive, purpose,

scheme and so forth, as provided by that section of the code; so if those are the only two objections that counsel for the defendant have, and those are the only two reasons for the motion—are there any other reasons for the motion than these two?

MR. FARBER: No, those are the only reasons.

THE COURT: If those are the only reasons for the motion, the Court will overrule it."

(And thereupon the jury resumed their seats and the trial continued.)

There was no further inquiry along this line, but at Page 142 we find a similar inquiry being made of the defendant during his cross-examination by the assistant prosecutor:

"Q. How long have you known Pauline? A. Well, a little better than eight years, about eight years and a half, something like that.

Q. She has a scar on her face, does she not? A. I think so.

Q. That scar was caused from a broken jaw, wasn't it? A. Well, yes, I think it was.

Q. How did she receive that broken jaw? A. Well—

MR. FARBER: Now I object to this line of questions.

THE COURT: Will counsel step up to the Bench?

(Thereupon counsel and the Court conferred at the Bench.)

THE COURT: The objection will be overruled.

MR. FARBER: Note an exception to the Court's ruling on the entire line of questioning as to any previous acts of this defendant toward the witness, Pauline Caudill.

(Question read.)

THE WITNESS: Am I supposed to answer that?

MR. FARBER: Yes, go ahead and answer it.

A. Well, how come this to happen, one Sunday evening she took a notion she wanted to go to her mother's house and it was something like twenty miles down there and we didn't have nothing but an old coal truck to go in and the lights weren't good on it and I told her, I said, 'I can't go down there today.' And she just jumped and pulled her clothes off—or her coat off and said, 'I am going to whip you', and just made a pass at me and I kind of shoved her that way back on the bed and I think the side of her jaw hit the bed rail and broke her jaw."

At Page 160 of the record Mr. Farber, counsel for the defendant, made this further inquiry:

"Q. You were questioned on cross-examination about an instance in which Pauline was supposed to have been cut in Ashland; were you arrested for that? A. Yes, sir.

Q. When were you released? A. The next day.

Q. Were you ever prosecuted for that? A. No, sir, I wasn't.

MR. MARTIN: ·I object.

THE COURT: Well, that was gone into on cross-examination. I will permit him to answer.

MR. MARTIN: It is repetitious.

THE COURT: Well, he may answer.

MR. FARBER: That is all.

Q. (By Mr. Martin) Why were you not prosecuted; isn't it a fact that Pauline failed to appear against you? A. No, she didn't fail to appear against me as I know of.

MR. MARTIN: That is all."

We have attempted to include in full all the testimony including objections and rulings falling within the class which counsel for defendant claim constituted prejudicial error.

During the ruling the trial court repeatedly stated not in the presence of jury that the evidence of an additional offense or additional similar acts was admissible under the provisions of §13444-19 GC, making particular reference to that part of the section, which reads as follws:

"Any like acts or other acts of the defendant which may tend to show his motive, intent, the absence of mistake or accident on his part, or the defendant's scheme, plan or system in doing the act in question, may be proved, whether they are contemporaneous with or prior or subsequent thereto, notwithstanding that such proof may show or tend to show the commission of another or subsequent crime by the defendant."

This provision of the section creates an exception to the general rule. There can be no doubt that under the general rule you may not introduce other separate, independent offenses for the purpose of showing that he committed the offense for which he stands charged. **12 O. Jur., p. 354, §333; 22 C. J. S., 1084.**

The reason for the rule is set out in the case of Knight v State, 54 Oh St 365 at page 379;

"That such evidence tends to draw away the minds of the jurors from the point in issue, and to excite prejudice and mislead them; and moreover, the adverse party having had no notice of such a course of evidence, is not prepared to rebut it."

The case of Whitman v State, 119 Oh St 285 discusses the question herein involved. The following decisions of our Supreme Court present a very clear pronouncement of the instances wherein the introduction of evidence of other crimes over the objection of the defendant is prejudicially erroneous.

Barton v State, 18 O. 221.
Coble v State, 31 Oh St 100.
Hamilton v State, 34 Oh St 83.
Baxter v State, 91 Oh St 167.
State v Dickerson, 77 Oh St 60.

In the interest of shortening this opinion, we purposely refrain from quoting from the above decisions and furthermore a reading of the entire case is really essential to a thorough understanding of the principles announced and the reasons therefor.

During this term of court we released an opinion in another county where we determined that the inquiry about other offenses was not only improper but was prejudicial. In that case we referred to the following authorities which should be read in connection with this case,

Wagner v State, 115 Oh St 136.
Turner v State, 21 Abs 276.
Spafford v State, 10 C. C. (N. S.), 185.
Ohio v Kennedy, 72 Oh Ap 462.
Ohio v Markowitz, 138 Oh St 106.
O. Jur. 12; 354, §333.

Some Ohio cases illustrative of the exception to the general rule which is provided by §13444-19 GC., supra, are:

Russell v State, 126 Oh St 114.
State v Hahn, 59 Oh Ap 178.
State v Whigham, 60 Oh Ap 182.

A text covering exceptions will also be found in **12 O. Jur. §323 et seq.,** under the title "Criminal Law". The notes in the text refer to several Ohio decisions including above and others.

Following a very careful reading of the record in connection with the above cited authorities, we find ourselves at issue with the trial court as to the competency of this evidence. We are unable to follow the reasoning claiming that the evidence of other crimes, as presented in the instant case, are competent by reason of **§13444-19 GC.**

Insofar as the record discloses, the cutting or assaults by defendant of Pauline in Ashland are not shown to have any similarity in the animus. It is true that in both instances the cutting was with a knife and in the groin, but the mere coincidence that the deceased in the instant case was cut with a knife and in the groin certainly would not be enough to make such evidence competent. So far as shown by the record, the occurrences in Ashland could not in any way assist in the determination of the question of intent in the instant case. The record very clearly shows that whatever feeling may have existed between the defendant and Pauline at the time of the occurrences in Kentucky, was all forgiven and forgotten before the defendant moved to Columbus, Ohio. This is necessarily evidenced by the fact that Pauline went down to Kentucky and induced the defendant to come to Columbus and even paid his fare and thereafter for a time they continued to live together as man and wife. The courts have very definitely determined that the mere fact that the same technique was adopted in committing the offense then being tried as was used in a prior offense is not, standing alone, sufficient. In determining the extent to which a prosecutor may go in introducing other crimes or similar acts, we must adopt a rule of reason. Try as we may, we cannot, through any rational process conclude that evidence of the commission of a crime in Kentucky could possibly aid the jury in the question of intent in the instant case.

What was the probable and natural affect on the jurors in the light of this evidence and its intendments?

The defendant was indicted and on trial for homicide and the killing of Ritchey by cutting him with a knife. The defense

interposed upon the State the burden of establishing by a requisite degree of proof that the killing was intentional. The incision, made by an ordinary knife, was small and, but for the vital place where inflicted, would not have been fatal. The defendant had the burden in his plea of self defense to establish that the killing was justifiable or excusable, which he sought to do by proving that he was not the aggressor.

The jury had before it for consideration that in the fall of 1942 at Ashland, Kentucky, the defendant cut Pauline Caudill with a knife in the groin and further that the scar on her face was caused by a broken jaw inflicted by the defendant on her at another time. Although this testimony was admitted by the court as tending to show motive, the jury was not so informed and thus it was before them for all probative purposes to which they might give it application. What then was its natural effect on their minds? Certainly it affected them as it would affect any normal person. It would obviously create the impression that the defendant was a vicious assailant who attacked without cause or reason and that he had a predilection to cut. In other words, it tended very materially to establish by proof of the unrelated offenses, that the defendant was guilty of the offense charged. The testimony operated in all of its normal effects for the reason set out in the quoted portion of the opinion in Knight v State, supra.

If, under any theory, we are wrong in our conclusion in determining prejudicial error in the admission in evidence of other crimes, then we call attention to another principle of law, in effect, holding that even if such testimony was admisable, it was prejudicially erroneous to receive it without the instruction of the court limiting it to the purpose for which it was received. Ohio decisions are uniform in their holding. We refer to the following:

State v Davis, 90 Oh St 100.
Baxter v State, 91 Oh St 167.
Barrett v State, 104 Oh St 298.
Lyon v State, 116 Oh St 266.
Scott v State, 107 Oh St 475.

Some of the above cited cases indicated very clearly that, where evidence of this character is properly presented, the court should at once instruct the jury the reason for its admis-

sability so as to remove from their minds any possibility that they are receiving it as substantive evidence of the guilt of the accused in the case being tried.

Some of the cases, although not with a similar degree of certainty, indicate that such an instruction in the general charge of the court might be sufficient. In the instant case, the trial court inadvertently did not give such an instruction, either at the time the improper evidence was admitted, or in the general charge to the jury following argument. This omission was vital.

It is our conclusion that both the introduction of the evidence of former offenses and the failure of the trial court to instruct as to the purpose of this testimony, constituted error and was prejudicial in character.

While it is true that the decisions were prior to the enactment of §13449-5 GC, yet the curative provisions of this section cannot save the verdict and judgment.

The language of the section, wherein it provides that no judgment of conviction shall be reversed unless it affirmatively appears in the record that the accused was or may have been prejudiced, thereby, adds nothing through the words "affirmatively appears." The adverb "affirmatively" modifying "appears" adds or detracts nothing from the plain import of the language employed. If it "appears" that the admission of the evidence may have prejudiced the accused, its acceptance was prejudicial to him.

With such an unbroken unanimity of adjudication by our courts of last resort on the very question here presented, we may not properly let this conviction and sentence stand.

Therefore, the judgment of the trial court will be reversed and case remanded for new trial.

HORNBECK, J., concurs.
GEIGER, J., dissents.

GEIGER, J., dissenting:

I have read with interest the strong opinion of Judge Barnes. However, I am of the opinion that this case falls under the curative provisions of §13449-5 GC.

I have recently elaborated my views upon this point in a case entitled State of Ohio v Witsel, Montgomery County, No.

1780, February 10, 1944, involving the same principles and to which the majority refers anonymously, and I shall, therefore, refer to my opinion in this case rather than repeat what I have there said.

As to the claim of the defense that there was prejudicial error in that the Court did not instruct the jury of the limitations of the evidence introduced, I am of the opinion that the case of **State v Moon et, 124 Oh St 465, at p. 470,** sufficiently answers this objection.

It must not be overlooked that the defendant has interposed a defense of self defense. I am of the opinion that §13444-19 GC, would permit the introduction of the evidence in reference to his former violent actions even though they may not be similar or connected directly with the case at bar.

The Section says:

"In any criminal case where the defendant's motive, intent, the absence of mistake or accident on his part * * * is material, any like acts * * * may be proved whether they are contemporaneous with or prior or subsequent thereto, notwithstanding such proof may show or tend to show the commission of another or subsequent crime by the defendant."

See **Whitman v State, 119 Oh St 285,** where the same principles are recognized, although it does not appear that that decision gave consideration to the statutory provisions as found in §13444-19 GC. In fact, this decision preceded in time the passage of the statute.

In the case of **Whitman v State,** the decision was rendered on November 14, 1928. On April 17, 1929, §13444-19 GC (113 O. L. 190) was enacted, and it seems to me this was done to make certain the right of the State to introduce the evidence such as was introduced in the case at bar, especially where his defense was self defense. All cases decided prior to the effective date of the act of April 17th, 1929, **113 O. L. 123** (pp. 190 and 196) when §§13449-5 and **13444-19** were first enacted, must be read in the light of these curative statutes. They are plain, easily understood, and broad in their provisions and have a well defined purpose, which is to rid the trial of criminal cases of the danger of reversal on account of inconsequential errors during or after trial.